

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PHILIP P. KALODNER | : | CIVIL ACTION |
| v. | : | |
| GENWORTH LIFE AND ANNUITY INSURANCE COMPANY | : | NO. 16-4817 |

FILED
JUN 26 2017
KATE BARKMAN, Clerk
By_____Dep. Clerk

**MEMORANDUM**

**Padova, J.** June 26, 2017

Plaintiff Philip P. Kalodner commenced this breach of contract action against Defendant Genworth Life and Annuity Insurance Company in order to challenge the methods by which Defendant calculated the Cost of Insurance in assessing Plaintiff's premiums under a Whole Life Insurance Policy. Defendant has moved to dismiss the First Amended Complaint ("the Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the following reasons, we grant Defendant's Motion.

**I. BACKGROUND**

The Complaint alleges that, in 1999, when Plaintiff was 68 years old, he purchased a $500,000 flexible premium adjustable life insurance policy (the "Policy") from Defendant. (Compl. ¶¶ 1-2, 8.) The Policy provides that Plaintiff will pay monthly premiums and, consistent with that obligation, Plaintiff has made more than $145,000 in premium payments over the life of the Policy. (Id. ¶¶ 6, 21.) Defendant charges against the paid premiums a monthly "Cost of Insurance" fee as well as other charges and fees. (Id. ¶ 6.) At the same time, Defendant credits Plaintiff's account with monthly interest on the accumulated premiums, and the Policy guarantees that the monthly interest credited will be calculated at an annual rate of at least 4%. (Id. ¶¶ 6, 8.)

The Cost of Insurance rate is calculated by means of a formula set forth in the policy, which is "'based on [Defendant's] expectation of future: mortality; interest; expenses; and persistency.'" (Id. ¶ 6 (quoting Policy, attached as Ex. A to Compl., at 12).) Specifically, the Policy provides that Defendant will use this four-factor formula to develop a "monthly mortality rate," and then will use this monthly mortality rate to calculate the Cost of Insurance rate, which, in turn, it will use to calculate the Cost of Insurance. (Policy at 12.) The Policy therefore provides that "[a] change in [the Cost of Insurance] rate will be due to a change in [Defendant's] expectation in one or more of [the four] factors," i.e., mortality, interest, expenses, and persistency. (Id.) The Policy also states that the Mortality Table that Defendant will use to calculate rates under the Policy will be the "Commissioners 1980 Standard Ordinary Smoker or NonSmoker Mortality Table, Sex Distinct, Age Nearest Birthday."[1] (Compl. ¶ 9 (quoting Policy at 3); see also Policy at 3.) Finally, attached to the Policy is a schedule of guaranteed maximum monthly mortality rates, which reflect the maximum monthly mortality rates that Defendants will use each year from Plaintiff's age 68 to age 99. (Id. ¶ 8; Policy at 12 and 3B).)

The insurance agent who sold the Policy to Plaintiff provided Plaintiff with a "Life Insurance Illustration." (Id. ¶ 10; see also Life Insurance Illustration, attached as Ex. B. to Compl.) "The Illustration contained tables setting forth policy values at various future points [in time], i.e., [Policy] years 2, 5, 10, 20, 26." (Compl. ¶ 12.) The Illustration was based on an "assumption that the planned annual premiums would be paid on schedule," and set forth three scenarios, one with an assumption of the guaranteed interest rate of 4%, one with a continuation of the current interest rate of 6%, and one with a midpoint interest rate of 5%. (Id. ¶ 12; Compl. Ex. B at 4.) The Illustration further stated that it "'assumes that the currently illustrated

---

[1] A "Mortality Table" is a "chart showing rate of death at each age in terms of number of deaths per thousand." Rubin, Dictionary of Insurance Terms 322 (5th Ed. 2008).

non-guaranteed elements' (i.e. the interest rate and [the mortality rates calculated based on Defendant's expectations]), 'will continue unchanged for all years shown.'" (Compl. ¶ 16 (quoting Compl. Ex. B. at 2.) It simultaneously warned that "this is not likely to occur" and that "actual results may be more or less favorable than those shown" because "[c]urrently illustrated non-guaranteed elements may change at any time." (Compl. Ex. B. at 2.) The Illustration further indicated that, with a continued interest rate of 6%, and timely payment of annual premiums, the Policy would continue in force for 26 years, i.e., until Plaintiff reached the age of 95. (Compl. ¶¶ 13.) At the same time, the Illustration showed that, if the interest rates decrease to either 5% or 4%, the Policy would terminate at year 16 "unless a higher premium is paid." (Compl. Ex. B at 4, 5.) Plaintiff was required to sign the Illustration both to acknowledge that he received it and to memorialize his understanding that the "non-guaranteed elements illustrated are subject to change and that actual values and benefits based on these non-guaranteed elements may be <u>more or less favorable</u> than those shown." (Compl. ¶ 17; Compl. Ex. B at 4.)

Neither the Illustration nor the insurance agent identified the applicable Cost of Insurance rates used for the Illustration or provided Plaintiff with the schedule of annual current mortality rates that were used. (Id. ¶ 14.) Specifically, the insurance agent did not provide Plaintiff with the "Schedule of Annual Current Mortality Rates dated September 6, 1995" (the "1995 Mortality Schedule"), which Defendant used to calculate the Cost of Insurance rates that it ultimately employed. (Id. ¶ 15; 1995 Mortality Schedule, attached as Ex. C to Compl.) Defendant has continued using the 1995 Mortality Schedule to calculate the Cost of Insurance rates. (Id. ¶ 18.) Defendant nevertheless acknowledges that it was authorized under the Policy to change the Cost of Insurance rates based on its expectations of mortality, interest, expenses and persistency. (Id. ¶ 18.) Significantly to Plaintiff, the 1995 Mortality Schedule reflects a very

3

large, 46%, increase in mortality between age 82 and 83, after only a 9% increase the prior year. (Id. ¶ 19.)

Over the life of the Policy, Defendant continuously changed the interest rates used to calculate the interest credited to the Policy, such that the rates have ranged from 4% to more than 6%. (Id. ¶ 22.) Defendant has not, however, strayed from using the mortality rates in the 1995 Mortality Schedule in calculating the Cost of Insurance charged against the Policy, in spite of "a subsequent study by the Commissioners (based on 1990-1995 mortality experience) [that] reflected a decline in mortality rates of 15%-17%." (Id. ¶¶ 23-24.)

On March 5, 2014, Defendant responded by letter to a request from Plaintiff for an explanation of the Cost of Insurance rates that it was using. (Compl. ¶ 18; March 5, 2014 letter, attached as Ex. 2 to Def.'s Mot.) Defendant provided Plaintiff with a copy of the 1995 Mortality Schedule, explained that it divided the annual rates listed on that Schedule by 12 to determine a monthly mortality rate, and then did a calculation using the monthly mortality rate and the interest rate to determine the monthly Cost of Insurance rate. (Def.'s Mot. Ex. 2 at 2.) At the same time, Defendant reminded Plaintiff that the mortality rates in the 1995 Mortality Schedule were not guaranteed, and that it could "change the[] mortality rates due to a change in [its] expectation of one or more of these factors: mortality, interest, expenses, and persistency." (Id. at 3.)

On April 1, 2014, Defendant responded to a follow-up inquiry from Plaintiff as to how it developed the nonguaranteed mortality rates set forth in the 1995 Mortality Schedule. (April 1, 2014 Letter, attached as Ex. 4 to Def.'s Mot.) Defendant explained that it "first developed pricing assumptions with respect to anticipated future mortality, lapses, interest, expenses; including reserves, commissions and required surplus, and anticipated distribution of premium patterns to be paid by policyowners." (Compl. ¶ 20; Def.'s Mot Ex. 4.) It further stated that "[t]hese assumptions were then modeled to arrive at a profit margin consistent with the goal of

4

producing a policy that would be highly competitive with whole life policies. The result of this process is the table of nonguaranteed mortality rates." (Compl. ¶ 20; Def.'s Mot. Ex. 4.)

Plaintiff's First Amended Complaint includes three Counts. Count I asserts that Defendant breached its contract with Plaintiff by calculating Cost of Insurance rates in a manner that is inconsistent with the formula set forth in the policy, i.e., by not only considering mortality, interest, expenses and persistency, but by also engaging in unspecified "modeling." Count II asserts that Defendant breached its contractual duty of good faith and fair dealing by setting Cost of Insurance rates that increased by 46% in the Policy's 16th year, which the Complaint "presume[es] was motivated by a desire to obtain [Plaintiff's] abandonment of the Policy." (Compl. ¶ 32.) Count III asserts that Defendant breached its contract with Plaintiff by failing to reset the Cost of Insurance to reflect decreases in mortality rates.

## II. LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. DelRio-Mocci v. Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (citing Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011)). Legal conclusions, however, receive no deference, as the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" Wood v. Moss, 134 S. Ct. 2056, 2065 n.5 (2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim,"

5

Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (citing Twombly, 550 U.S. at 556). In the end, we will grant a motion to dismiss brought pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "'to raise a right to relief above the speculative level.'" W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 169 (3d Cir. 2013) (quoting Twombly, 550 U.S. at 555).

## III. DISCUSSION

Defendants argue that we should dismiss all three Counts of the Complaint because each claim fails as a matter of law. Under Pennsylvania law, "a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (alteration in original) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super .Ct. 1999)); see also Chemtech Int'l, Inc. v. Chemical Injection Techs., Inc., 247 Fed. App'x. 403, 405 (3d Cir. 2007) (same) (quoting Ware, 322 F.3d at 225). In addition to the terms explicitly set forth in the contract, "'[e]very

6

contract imposes a duty of good faith and fair dealing on the parties in the performance and the enforcement of the contract.'" J.J. DeLuca Co. v. Toll Naval Assocs., 56 A.3d 402, 412 (Pa. Super. Ct. 2012) (quoting Giant Food Stores, LLC v. THF Silver Spring Dev., L.P., 959 A.2d 438, 447-48 (Pa. Super. Ct. 2008)); see also Creeger Brick & Bldg. Supply, Inc. v. Mid–State Bank & Trust Co., 560 A.2d 151, 153 (Pa. Super. Ct. 1989) (stating that the implied duty of good faith "has been imposed upon the relationship between insurer and insured" (citations omitted)). Generally, "[t]he covenant of good faith and fair dealing involve[s] an implied duty to bring about a condition or to exercise discretion in a reasonable way." USX Corp. v. Prime Leasing, Inc., 988 F.2d 433, 438 (3d Cir. 1993) (second alteration in original) (quotation omitted). However, "[t]here can be no implied covenant as to any matter specifically covered by the written contract between the parties." Id. at 439 (quoting Reading Terminal Merchants Ass'n v. Samuel Rappaport Assocs., 456 A.2d 552, 557 (Pa. Super. Ct. 1983)); see also Creeger Brick, 560 A.2d at 153 (stating that the implied duty of good faith cannot defeat a party's express contractual rights by imposing obligations that the party contracted to avoid).

The Pennsylvania Supreme Court has advised that the goal of insurance contract interpretation is "'to ascertain the intent of the parties as manifested by the language of the written instrument.'" Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) (quoting Gene & Harvey Builders v. Pa. Mfrs. Ass'n, 517 A.2d 910, 913 (Pa. 1986)). "'Where . . . the language of the [insurance] contract is clear and unambiguous, a court is required to give effect to that language.'" Id. (quoting Gene & Harvey Builders, 517 A.2d at 913). On the other hand, "'[w]here a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.'" Id. (quoting Gene & Harvey Builders, 517 A.2d at 913).

7

## A. Count I

Defendant moves to dismiss Count I, which asserts that it breached the Policy by failing to properly apply the four-factor formula in calculating Cost of Insurance rates. As noted above, the Policy requires Defendant to determine the Cost of Insurance rates for the Policy "based on its expectation of future: mortality; interest; expenses; and persistency." (Policy at 12.) Count I of the Complaint alleges that Defendant breached its obligation to determine the Cost of Insurance rates based on its expectation of these four defined factors insofar as it (1) also considered the "'anticipated distribution of premium patterns to be paid by policy owners,'" and (2) "'modeled'" its "'pricing assumptions with respect to anticipated future mortality, lapses, interest, expenses . . . , and anticipated distribution of premium patterns to be paid by policy owners'" to arrive at an acceptable profit margin. (Compl. ¶ 27 (quoting Def.'s Mot. Ex. 4).)

With respect to the allegation that it improperly considered "anticipated distribution of premium patterns to be paid by policy holders," Defendant states that this consideration is an element of "persistency," one of the four factors that it is expressly permitted to consider. In the insurance context, "persistency" means the "percentage of . . . policies remaining in force," i.e., "the percentage of policies that have not *lapsed*." Rubin, Dictionary of Insurance Terms 375 (5th Ed. 2008). Defendant contends that "persistency" also encompasses a concept called "premium persistency," and it maintains that its consideration of premium patterns was pertinent to such "premium persistency." It thereby argues that the Policy, by authorizing it to consider "persistency" in setting the Cost of Insurance, unambiguously authorizes it not only to consider lapse rates but also to consider premium funding patterns.

Defendant, however, offers little support for its assertion that the dictionary definition of "persistency" is incomplete and that "persistency" also necessarily includes the concept of "premium persistency." In the absence of greater clarity as to the accepted meaning of

8

persistency in the industry, and the meaning of the term in this Policy in particular, we cannot conclude at this early stage of the proceedings that Defendant's right to consider "persistency" under the Policy unambiguously gives it the right to consider premium patterns. See Fleischer v. Phoenix Life Ins. Co., 18 F. Supp. 3d 456, 475 (S.D.N.Y. 2014) (concluding that defendant insurance company's assertion that persistency can mean either "policy persistency" or "premium persistency," even if correct, rendered meaning of "persistency" ambiguous). Accordingly, we conclude that Defendant has failed to establish that the Policy unambiguously authorizes it to consider premium patterns when setting the Cost of Insurance. We therefore deny its Motion insofar as it asks us to dismiss Plaintiff's claim that it breached the Policy by considering such premium patterns.

With respect to the allegation that Defendant engaged in inappropriate "modeling" in setting Cost of Insurance rates, we reiterate that the Policy, by its terms, permits Defendant to set Cost of Insurance rates based on its expectations concerning the four defined factors. (Policy at 12.) Defendant maintains that its "modeling" is merely the method by which it determines its expectations, i.e., it "employ[s] actuarial formulas to calculate each of the factors and to then combine those factors to determine the monthly mortality rates." (Def.'s Mem. at 10.) Indeed, actuarial calculations are "statistical calculation[s]" that are performed by individuals "trained in mathematics and statistics whose business it is to calculate insurance . . . premiums, reserves, and dividends." (Merriam-Webster Unabridged Online Dictionary, 2017 (defining "actuary" and "actuarial")). As such, there can be no question that the actuarial calculations that Defendant performed in setting expectations (essentially, predicting the future) require some measure of mathematical and statistical modeling.

Apparently acknowledging that Defendant must engage in some modeling when setting its expectations, Plaintiff argues in his opposition to Defendant's Motion not that the Policy

9

prohibits Defendant from engaging in any modeling but, rather, only that it prohibits Defendant from engaging in modeling after the formulation of pricing assumptions based on the four defined factors. The Policy, however, does not impose any such limitation on Defendant's formulation of its expectations; it merely states that it will determine the Cost of Insurance rate based on its expectations of those four factors.[2] (Policy, at 12.) There is therefore no support in the Policy for Plaintiff's position that Defendant was prohibited from modeling, either in conjunction with or after it formulated pricing assumptions. Consequently, we conclude that Plaintiff has failed to allege facts that support a cognizable claim that Defendant breached the terms of the Policy by engaging in "modeling."

For the foregoing reasons, we conclude that the Complaint fails to set forth facts that support a plausible claim that Defendant breached the terms of the Policy by engaging in modeling, and we therefore grant Defendant's Motion insofar as it seeks dismissal of that aspect of Count I. However, we reject Defendant's argument that the Policy unambiguously permits it to consider premium patterns in setting the Cost of Insurance and, thus, we deny its Motion insofar as it seeks dismissal Count I's claim that Defendant breached the Policy by considering premium patterns.

### B.    Count II

Defendant moves to dismiss Count II, which asserts that Defendant calculated Cost of Insurance rates in a way that breached its duty to engage in good faith and fair dealing.

---

[2] Plaintiff focusses on Defendant's April 2014 letter, which states that Defendant developed pricing assumption and then modeled those assumptions to create the 1995 Mortality Schedule. (Def.'s Mot. Ex. 4.) Plaintiff contends that the setting of pricing assumptions is the equivalent of the formulation of expectations, and he therefore maintains that Defendant "acknowledge[d]" in the letter that it calculated a rate based on expectations and then modeled the result. (Pl.'s Resp. Br. at 12.) However, there is no basis in the Policy or the April 2014 letter to conclude that Defendant formulated -- or was required to formulate -- Cost of Interest rates based exclusively on its initial setting of pricing assumptions. Accordingly, unlike Plaintiff, we do not equate Defendant's setting of pricing assumptions with the formulation of expectations.

Specifically, Plaintiff claims that, even if the Policy permitted Defendant to engage in modeling in setting the Cost of Insurance rates, Defendant nevertheless breached its duty of good faith and fair dealing when it calculated the monthly mortality rates in a way that resulted in a 46% increase in the Cost of Insurance in year 16, when Plaintiff was 83 years old.

Defendant argues that Count II fails as a matter of law because Plaintiff had no contractual expectation of, or entitlement to, monthly mortality rates that were lower than the maximum monthly mortality rates set forth in the Table of Guaranteed Maximum Mortality Rates attached to the Policy (the "Table of Guaranteed Mortality Rates"). (See Policy at 3B.) Because the Complaint does not allege that the monthly mortality rates that Defendant employed were higher than the maximum rates in the Table of Guaranteed Mortality Rates, Defendant maintains that it "set monthly mortality rates – and calculated [Cost of Insurance] rates – consistent with its obligations." (Def.'s Mem. at 11.)

While the Complaint does not allege that Defendant violated its obligation to utilize mortality rates no higher than those set forth in the Table of Guaranteed Mortality Rates, Plaintiff maintains that Defendant's duty of good faith and fair dealing imposed a separate limit on the rate at which Defendant could increase the Cost of Insurance over time. In Plaintiff's view, the maximum rates simply provide "additional protection" in the event that Defendant's "right . . . to recalculate rates in accordance with changes in the four elements of the formula . . . result[ed] in a higher rate than those in the schedule of maximum rates." (Pl.'s Resp. Br. at 17.) Plaintiff argues that "the four element formula clearly cannot have resulted in the 46% increase in the 16th year," and that it was therefore Defendant's discretionary "modeling" that resulted in the 46% increase and violated the duty to act in good faith and engage in fair dealing. (Id. at 16.)

However, as noted above, Defendant was contractually permitted to engage in modeling in formulating its expectations with respect to mortality, interest, expenses and persistency.

11

Thus, Plaintiff's only remaining claim is that such modeling violated Defendant's duty of good faith and fair dealing when it produced an unusually large increase in monthly mortality rates in the 16th year. This claim, however, asks us to impose an implied contractual obligation that is inconsistent with the terms of the Policy. As noted above, "[t]here can be no implied contract [of good faith and fair dealing] as to any matter that is specifically covered by the written contract." USX Corp., 988 F.2d at 439 (citation omitted). Here, Defendant contracted to calculate the monthly mortality rates and Cost of Insurance rates based on its expectations of mortality, interest, expenses, and persistency, and promised only that the monthly mortality rates that it utilized would not exceed the rates set forth in the Table of Guaranteed Mortality Rates. Accordingly, while Plaintiff may bring a breach of contract claim if Defendant failed to calculate the Cost of Insurance rates pursuant to the contractual formula or utilized monthly mortality rates that exceeded the guaranteed monthly mortality rates, he may not bring a separate claim for breach of the duty of good faith and fair dealing based solely on the imposition of Cost of Insurance increases that he deems excessive. Rather, any implied duty to further limit the monthly mortality rate to a level lower than the rates in the Table of Guaranteed Mortality Rates would improperly impose an implied duty "as to [a] matter that is specifically covered by the written contract." Id.

Under these circumstances, the Complaint fails to allege facts that support a cognizable claim that Defendant violated any duty to act in good faith or engage in fair dealing insofar as it engaged in modeling that produced a large increase in the monthly mortality rate in the 16th year of the Policy. We therefore grant Defendant's Motion to Dismiss insofar as it seeks dismissal of Count II of the Complaint.

C.   **Count III**

Defendant moves to dismiss Count III, which asserts that Defendant breached the Policy by failing to revise its monthly mortality rates to take into account a 15-17% decline in mortality rates as reflected in the results of a study that the Commissioners conducted of 1990-1995 mortality rates. (Compl. ¶¶ 23-24, 37-38.) Specifically, Plaintiff contends that Defendant breached its contract with him when it computed the Cost of Insurance rates using the mortality rates set forth in the 1995 Mortality Schedule because those mortality rates were calculated using outdated mortality numbers. Defendant argues that we should dismiss this claim not only because it had no contractual obligation to lower its Cost of Insurance rates to reflect new mortality rates, but also because the Complaint does not plausibly allege that Plaintiff has been damaged by Defendant's failure to use updated mortality rates.

Plaintiff does not contend that the Policy expressly imposes an obligation on Defendant to change its Cost of Interest calculations based on a reduction in the rate of mortality. Instead, he argues that Defendant's obligation to recalculate its "expectation of mortality, interest, expenses and persistence" when mortality rates change is "implicit in [Defendant's] recognition . . . [in the Illustration] that the result of [a recalculation] may be 'more or less favorable'" to Plaintiff. (Pl.'s Resp. Br. at 19-20.) He further asserts that the contractual obligation exists because Defendant, in its March 2014 letter, "continues to affirm its right to 'change the[] monthly [Cost of Insurance] rates due to a change in [its] expectation of one of more of [the four] factors: mortality, interest, expenses, and persistency.'" (Id. at 20 (quoting Def.'s Mot. Ex. 2 at 3).)

However, there is simply nothing in the Policy that requires Defendant to change its Cost of Insurance rates to reflect changing mortality rates. While the Policy says that "a change in [the Cost of Insurance] rate will be due to a change in Defendant's expectation in one or more of the[] factors," it does not impose any requirement that Defendant reassess its expectations and

13

alter the rate accordingly. (Policy at 12.) Indeed, the Complaint alleges that Defendant has continuously used the 1995 Mortality Schedule to calculate the Cost of Insurance (Compl. ¶ 18), making clear that, throughout the life of the Policy, Defendant has never reassessed its expectations in order to alter the Cost of Insurance rate, either favorably or unfavorably to Plaintiff.

Moreover, the Policy explicitly states that the Mortality Table on which Defendant will base its calculations is the "Commissioners 1980 Standard Ordinary Smoker or Nonsmoker Mortality Table, Sex Distinct, Age Nearest Birthday" (the "1980 CSO Table"). (Policy at 3.) Thus, Plaintiff's argument that Defendant, when computing its expectations based on the four-factor formula, was required to replace the mortality rates in the 1980 CSO Table with updated rates developed in a 1990-1995 study conducted by the Commissioners is simply inconsistent with the terms of the Policy, which specifies the 1980 CSO Table as the applicable Mortality Table.

In sum, we conclude that the Policy does not require Defendant to use updated mortality figures in its four-factor analysis, but rather required it to consistently refer to the mortality rates in the 1980 CSO Table. We therefore conclude that the Complaint fails to allege facts that support a cognizable claim for breach of contract in Count III of the Complaint,[3] and we grant Defendant's Motion as to that Count.[4]

---

[3] To the extent that Plaintiff bases this claim on an assertion that Defendant violated a duty of good faith and fair dealing by utilizing outdated mortality figures, we likewise conclude that the claim fails because the Policy specifically states that the applicable Mortality Table is the 1980 CSO Table. See USX Corp., 988 F.2d at 439 (explaining that a good faith and fair dealing claim cannot arise out of "matter that is specifically covered by the written contract.") (quotation omitted).

[4] Given our conclusion that the Policy does not require Defendant to recalculate the Cost of Insurance based on updated mortality figures, we need not reach Defendant's alternative argument that the Complaint does not adequately allege that Plaintiff was damaged by
14

## IV. CONCLUSION

For the foregoing reasons, we grant Defendant's Motion to Dismiss as to Counts II and III, and we dismiss those two Counts. With respect to Count I, we grant the Motion in part and deny it in part. Specifically, we grant the Motion as to Count I insofar as it seeks dismissal of the claim that Defendant breached the Policy by engaging in modeling, but deny the Motion as to Count I insofar as it seeks dismissal of the claim that Defendant breached the Policy by considering premium patterns in setting the Cost of Insurance.

An appropriate Order follows.

BY THE COURT:

John R. Padova, J.

ENTERED

JUN 26 2017

CLERK OF COURT

---

Defendant's failure to utilize updated mortality figures. We nevertheless note that the Complaint does not expressly seek damages for Defendant's alleged breaches but, instead, requests that we order Defendant to recalculate the Policy Value "in all months from the issuance of the Policy to the date of relief," using "as the mortality factor one reflecting the reduced mortality experience subsequent to that reflected in the [1980 CSO Table] utilized in calculating the [1995 Mortality Schedule]." (Compl. at 15 ¶ 1.) The Complaint does not, however, explicitly allege that Defendant's use of the mortality rates in the 1980 CSO Table (instead of updated mortality figures) throughout the life of the Policy has resulted in a reduced Policy Value.

15